IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


MICHAEL W. MCDONALD, JR,              :

                 Plaintiff              :       Civil Action 2:09-cv-314

      v.                                   :       Judge Holschuh

COMMISSIONER OF SOCIAL                :       Magistrate Judge Abel
SECURITY,
                            :
              Defendant


# REPORT AND RECOMMENDATION


Plaintiff Michael W. McDonald, Jr., brings this action under 42 U.S.C. §423
for review of a final decision of the Commissioner of Social Security denying his
application for disability insurance benefits and supplemental security income. The
matter is before the Magistrate Judge for a report and recommendation on the
disposition of this matter.


Summary of Issues.

Plaintiff McDonald filed an application for disability benefits in April 2004
stating that he had been disabled since 2001, at age 32, by back injuries, neck pain,

carpal tunnel syndrome, and Graves' Disease.[1]  The administrative law judge found

that McDonald retains the ability to perform light work, subject to certain

restrictions.

Plaintiff McDonald argues that the decision of the Commissioner denying

benefits should be reversed because the Commissioner incorrectly found that he had

a high school education, despite also finding that he had a "severe" learning

disorder, and because the Commissioner gave little weight to the opinion of his

longtime treating specialist that he needed a sit/stand option and only sedentary

work.


**Procedural History**.  Plaintiff filed his present application for a period of

disability and disability insurance benefits, and for supplemental security income,

on April 29, 2004.  (R. 17.)  He had previously filed for DIB in September 2003, but

this application was denied.  (R. 65-67.)  McDonald claimed that he became disabled

on September 1, 2001, citing back injuries, neck pain, carpal tunnel syndrome, and

Graves' Disease.  (R. 56.)  The claims were denied initially and upon

reconsideration.  Plaintiff sought a hearing before an administrative law judge.  On

August 20, 2007, an administrative law judge ("ALJ") held a hearing, at which

Plaintiff, represented by counsel, appeared and testified.  (R. 563.)  On August 27,

2007, the ALJ issued a decision finding that McDonald had not been under a

---

[1]  Plaintiff has addressed on appeal only the issues of his level of education
and of his back pain and related capabilities.

disability since the date of application. (R. 26.) On February 20, 2009, the Appeals

Council denied Plaintiff's request for review and adopted the administrative law

judge's decision as the final decision of the Commissioner of Social Security. (R. 4-

6.) On April 22, 2009, Plaintiff timely filed this action.


**Age, Education, and Work Experience**. McDonald was born on June 26,

1969. (R. 25.) He completed the twelfth grade, though in special education. (R.

564.) Plaintiff worked for various companies between 1994 and 2001, as a laborer

and operator of a paving machine. (R. 565-6.) He last worked in 2001. (R. 114.)


**Plaintiff's Testimony**. The administrative law judge summarized McDonald's

relevant hearing testimony as follows:

> The claimant alleges that he experiences pain and intermittent
> soreness and stiffness throughout his lumbar region, which is
> exacerbated when he engages in any exertional activity. The claimant
> has further reported feeling numbness in his legs that is aggravated by
> driving for extended periods of time. Though the claimant states that
> sitting can also aggravate his back pain, he testified that he could
> possibly do a sitting job. The claimant takes several medications for
> back pain relief (Flexeril, Neurontin, Lodie, etc.) and has denied any
> adverse effects as a result of taking these medicines (Exhibit 16F,
> p.38). The claimant was also instructed to use superficial heat for
> treatment of his lower back pain (Exhibit 16F, p.32). At hearing, the
> claimant testified that he occasionally uses a cane or lies down to take
> the pressure off his back.
>
> As for the claimant's mental functioning, he reported that he has a
> learning disorder and was in special education classes during high
> school. [...]

(R. 23-24.)

McDonald testified at the hearing that he had some arithmetical ability, and that he could read and comprehend a simple newspaper article, but that he could not write a short letter. (R. 565.) He said that if he bent or lifted weight, he suffered pains in his lower back, right leg, and right hip. (R. 566.) McDonald described his back pain as constant and stabbing, and that in his leg as burning and accompanied by numbness. (R. 567.) He rated his pain as between a five and a seven on a scale of one to ten, depending upon the weather. (R. 568.) McDonald uses a cane during bad weather, and a back brace every day to reduce pain. (R. 569.) He said that a TENS unit had not helped. McDonald claimed to be able to sit or stand for about thirty minutes, to walk about two blocks, or to lift and carry about five or ten pounds. He said that he could work for eight hours with a sit/stand option. (*Id.*)

### Medical Evidence of Record.

Although the administrative law judge's decision fairly sets forth the relevant medical evidence of record, this Report and Recommendation will summarize that evidence in some detail.

### Physical Impairments.

State agency physicians. Drs. Charles A. Derrow and Jerry Liepack performed physical residual functional capacity assessments of McDonald's record in 2003 and 2004 for a state disability determination agency. Dr. Derrow, in his

assessment of December 15, 2003 (R. 276-280), opined that McDonald could occasionally lift fifty pounds and frequently lift twenty-five, that he could stand, walk, or sit for about six hours in an eight-hour workday, and that his ability to push or pull was unlimited.  He found no manipulative, visual, postural, communicative or environmental restrictions, except that McDonald could stoop only occasionally.  He concluded that McDonald's symptoms were attributable to a medically determinable impairment, but that claimant's statements of limitations were not fully supported by medical evidence and were thus not fully credible.

Dr. Liepack, in his assessment of June 21, 2004, made virtually identical findings.  (R. 370-374.)  He opined that McDonald could frequently stoop, but that he should never climb a ladder, rope, or scaffold.  Like Dr. Derrow, he found that McDonald's symptoms were attributable to a medically determinable impairment, but that claimant's statements of his physical limitations were only partially credible.

2003 MRI and x-ray imaging.  On January 3, 2003, McDonald underwent thoracic and lumbar spine series of x-rays.  These revealed no fractures or dislocations.  The radiologist noted moderate osteophyte formation anteriorly and laterally in several of the thoracic intervertebral disc spaces, moderate sized Schmorl's nodes in the thoracic spine, and a few small Schmorl's nodes in the lumbar spine.  He found moderate spondylosis in the thoracic spine, but none in the lumbar spine.  (R. 182.)

A January 20, 2003 MRI of the lumbar spine indicated degenerative joint

disease, low back pain with bilateral pain, and some numbness. (R. 306.) The MRI

revealed a Schmorl's node involving the superior/anterior aspect of L5, and a small

mass within the L4 vertebral body which was likely a vertebral body hemangioma.

It also demonstrated mild broad-based posterior bulging of the disk at the L3-4, L4-

5, and L5-S1 levels. The physician's impressions were that there was mild

degenerative disk changes at L3-4, L4-5, and L5-S1, with no focal disk bulge or

central canal stenosis. (*Id.*)

Jon Pearlman, M.D., 2003. Dr. Pearlman treated McDonald repeatedly

between January 27, 2003 and June 2, 2007. On March 18, 2003 Dr. Pearlman

referred McDonald to physical therapy for lower back pain. At the time of his first

session, McDonald reported aching lower back pain and numbness in his lower

extremities, which had started in 1997. He stated that the symptoms were

constantly present, and that they got worse if he stood, rose, sat, or walked.

McDonald stated that he was currently limited to 60 minutes of sitting and 30

minutes of walking. (R. 174.) The therapist opined that Plaintiff had a full range of

motion, with decreased function, and that he exhibited fair to good rehabilitation

potential. She recommended that he attend physical therapy three times a week for

six weeks. (*Id.*) His course of therapy concluded on May 2, 2003, after he had

consistently attended eighteen sessions. The therapist found that he had tolerated

the therapy very well, with decreased pain, and improved posture, function, and

body mechanics. She stated that McDonald had met most of his functional goals,

though he would continue to pursue his long-term goals with strengthening

exercises.  (R. 152.)

On June 2, 2003, McDonald followed up on his lower back pain complaints with Dr. Pearlman.  He complained of stiffness and aching pain throughout his lower back, with numbness and tingling about his right anterior lateral thigh.  He denied distal lower extremity pain, weakness or sensory loss.  Upon examination, Dr. Pearlman found McDonald's right hip range of motion to be full, with full strength.  He reviewed the January 30, 2003 MRI, and concluded that McDonald's right lower extremity paresthesias were suggestive of nerve root irritation at approximately L3 coinciding with L3-4 disc protrusion.  Dr. Pearlman's impressions were lumbar radiculitis and lumbar spondylosis, and he recommended a diagnostic LESI to include right L3-4 transforaminal approach, and a trial of Neurontin.  (R. 300.)  The lumbar epidural steroid injection was performed on June 10, 2003; McDonald tolerated the procedure well, and was discharged.  (R. 126.)

At his August 8, 2003 follow-up, however, Dr. Pearlman noted only "transient improvement" after the LESI, with improvement in his thigh numbness lasting about a week.  Dr. Pearlman prescribed Lodine 400 mg and Zanaflex 2 mg, and stated that McDonald would continue with his home directed exercise program.  (R. 299.)  At an October 7, 2003 follow-up, McDonald complained of constant aching lower back pain which had increased in the past few weeks.  He described pain radiating to his posterior hips and lateral thighs to just below his knee.  Dr. Pearlman, finding his complaints consistent with worsening of his L3-4 disc protrusion and radiculitis, continued him on his medications and ordered a new

MRI of the lumbar spine. (R. 298.) This MRI was conducted on October 15, 2003. It re-demonstrated multilevel degenerative changes, with no significant neural foraminal narrowing or central canal stenoses. (R. 218.) At a January 13, 2004 follow-up, McDonald reported continued pain. Dr. Pearlman interpreted the October 15, 2003 MRI, finding diffused disc bulge at L5/S1 eccentric to the left butting and deviating the left S1 nerve root. He found noted multilevel degenerative changes. After discussing his findings with McDonald, he referred him for orthopaedic spine consultation. (R. 297.)

F. Paul DeGenova, D.O. Dr. DeGenova, an orthopaedic surgeon, initially evaluated McDonald on January 16, 2004. At the time, McDonald claimed to have had low back pain for five or six years, with severe pain greater on the right side radiating into his buttocks. He also reported pain in his right anterior thigh, radiating to the posterior calf, and numbness in his right thigh and the dorsum of his right foot. McDonald claimed pain of 10 on a 1 to 10 scale, and again reported that Dr. Pearlman's LESI procedure had provided relief for less than a week. (R. 294.) Moreover, "he has had physical therapy, hot packs, TENS unit, body mechanic training, and strengthening exercises without much relief." McDonald stated that he was taking Tapazole for Graves disease, Lodine, Neurontin, Flexeril, Vicodin, Topamax, and Lexapro, and claimed to be smoking one to two packs per day.

After a physical examination of McDonald and reviewing the October 15, 2003 MRI, Dr. DeGenova diagnosed McDonald with lumbar degenerative disk

8

disease in L4-5 and L5-S1. (R. 295.) He discussed various treatment options with McDonald, including surgery, IDET, diskogram, and fusion of the lumbar spine, and recommended a diskogram. McDonald stated that he did not wish to have surgery, so Dr. DeGenova referred him back to Dr. Pearlman to consider an IDET. (*Id.*)

Jon Pearlman, M.D., 2004-2007. McDonald returned to Dr. Pearlman for a February 19, 2004 follow-up after his consultation with Dr. DeGenova. In addition to continued low back pain, McDonald complained of posterior cervical spine pain off and on for several years and progressively worsening, with occasional sharp head pains. (R. 291.) Dr. Pearlman's impressions were lumbar degenerative disk disease in L4-5 and L5-S1, and chronic cervical spine pain. However, Dr. Pearlman noted that the recommended IDET procedure was not covered by McDonald's insurance. He recommended a lumbrosacral corset and renewed McDonald's prescriptions, and referred him for x-rays and MRI to evaluate his chronic neck pain. (R. 292.)

On April 15, 2004, McDonald visited Dr. Pearlman for another follow-up. He claimed that the lumbrosacral corset had been minimally effective, and that his back and lower limb pain had continued. (R. 289.) McDonald had undergone x-ray and MRI examination on February 23, 2004; these were unremarkable, with the exception of minimal posterior bulging at the C5-6 and C6-7 discs. Upon physical examination, Dr. Pearlman found decreased range of motion in his head and neck, and good range of motion in the upper limbs and lower extremities. In addition to his impressions from the prior visit, Dr. Pearlman noted intermittent bilateral arm

paresthesias. (R. 290.) He refilled McDonald's prescriptions, and referred him for renal and hepatic blood work and for an upper extremity EMG/nerve conduction study. (*Id.*)

McDonald continued to see Dr. Pearlman for treatment of his back pain. On December 6, 2004, McDonald complained of recurrent back pain, but reported that physical therapy and home exercises had been beneficial. (R. 415.) Dr. Pearlman noted that his back pain was "stable" and responsive to exercise. On February 7, 2005, McDonald again reported intermittent soreness and stiffness through his lumbar region, with hip pain. Dr. Pearlman noted that McDonald was in no acute discomfort, and that his medications "helped maintain his overall functioning" and were being tolerated well. (R. 414.) He opined that the condition was stable and that pain only mildly increased with lumbar extension. On March 25, 2005, McDonald reported a recent slip and fall and increased back and hip pain; Dr. Pearlman noted muscular strain and possible aggravated degenerative disc problems. (R. 413.) He ordered new x-rays and MRI of the thoracic and lumbar spine.

On June 9, 2005, McDonald again visited Dr. Pearlman for back pain; Dr. Pearlman reviewed a new lumbar spine MRI of April 1, 2005, which showed bulging disc osteophyte complex at L5-S1 noted to mildly deviate the left S1 nerve root. MRI of the thoracic spine showed signs suggesting congenial changes, but no stenosis or acute disc injury. (R. 412.) Dr. Pearlman opined: "Overall, he has managed his condition well with his current medications, which he has tolerated

10

without difficulty."

On September 1, 2005, McDonald returned to Dr. Pearlman continuing to complain of lower back pain. He claimed that he had good days and bad days, but that the pain was aggravated by prolonged standing or walking, or lifting and bending. (R. 411.) McDonald again reported that his medications were helpful, and seemed in no obvious distress. Dr. Pearlman noted that McDonald's condition was stable and that he continued to suffer pain consistent with degenerative disc disease and lumbar spondylosis, but that he was managing well.

McDonald visited Dr. Pearlman again repeatedly from March 6, 2006 through June 26, 2007. On each occasion, McDonald continued to complain of lower back pain, but stated that his medications were effective in reducing his pain and permitting him to maintain functioning and activities. (R. 406, 407, 408, 525, 526, 527, 528.) On June 1, 2006, McDonald reported improvement in his flexibility from physical therapy, and stated that he would attempt to return to work with restrictions. However, on August 24, 2006, McDonald complained of increased lower back pain and more pronounced right thigh numbness following a canoeing trip. (R. 406.) Dr. Pearlman advised him to perform sedentary work, and ordered a new lumbar x-ray. This x-ray was performed on the same day, and reported minimal scoliosis centered at L4-L5, with no change in alignment with flexion and extension views. (R. 526.) At his March 7, 2007 follow-up, Dr. Pearlman noted that McDonald transferred from sit to stand without discomfort, and again reported that his condition was stable and that he was benefitting from his medications. (R. 527.)

However, McDonald complained at his June 26, 2007 visit of increased lower back pain over the previous four weeks, with increased burning pain and numbness in his right lateral thigh to his knee, which worsened with standing and walking. (R. 528.) Dr. Pearlman modified McDonald's medications, and ordered new x-rays and MRIs.

Dr. Pearlman completed a form physical capacities evaluation form in August 2007. (R. 524.) In it, he diagnosed McDonald with lumbar spondylosis, lumbar disc degeneration, and chronic low back pain, and opined that McDonald was unable to work an eight-hour day, but instead could work, stand, walk, or sit for no more than half an hour.[2] Dr. Pearlman also opined that McDonald could lift or carry no more than five pounds frequently, and 6-10 pounds occasionally, and that his abilities to push, pull, bend, reach, handle materials, and perform repetitive foot movements were affected by his condition. (*Id.*)

William Newman, M.D. Dr. Newman, an orthopaedic surgeon, testified at the hearing as a medical expert. (R. 578.) He noted that the April 1, 2005 MRI demonstrated a disc spur which was displacing the left S1 nerve root, causing symptoms on the right, but that neurologically McDonald had no sensory or reflex

---

[2] It is not clear whether, as McDonald seems to imply, Dr. Pearlman meant to convey that he could not sit or stand for more than ½ hour *at a time*. In the form, Dr. Pearlman filled "½" hour not merely for indications of how long McDonald could sit or stand without interruption, but for how long he could sit or stand at all in an eight-hour day. He further stated that Plaintiff could not work eight hours in a day, but rather "½" hour, and opined that McDonald was unemployable. The ALJ apparently took Dr. Pearlman at his word. (R. 24.) The difference does not affect the outcome of this analysis.

deficits. (R. 579.) Dr. Newman opined that "physically he should be able to do past work." (R. 580.)

### Mental Impairments.

Dr. Christopher L. Ray, Ph.D. On May 29, 2003, Dr. Ray, a psychologist at Mid-Ohio Psychological Services, Inc., conducted a psychological evaluation of McDonald pursuant to a referral from Fairfield County Children Services. (R. 241.) During this evaluation, McDonald reported that he had graduated from Lancaster High School, and had taken Learning Disabled classes due to problems in spelling and reading. (R. 245.) According to Dr. Ray, McDonald's high school transcript showed a cumulative grade point average of 2.53. (*Id.*)

Dr. Ray administered the Weschler Individual Achievement Test-Second Edition to clarify McDonald's academic functioning. He found that McDonald's Word/Reading score was in the first percentile, and fell into the Mentally Deficient range of functioning, on a level with an individual beginning sixth grade. His Numerical Operations score was in the 27th percentile, and fell into the Borderline range, on a level with an individual halfway through sixth grade. His Spelling score was in the tenth percentile, and fell into the Borderline range, on a level with an individual near the end of fifth grade. Dr. Ray noted a disparity between McDonald's Word/Reading and Numerical Operations/Spelling scores, which he concluded reflected a learning disorder and was consistent with McDonald's report of attending Learning Disabled classes. (R. 254.)

The psychologist also opined that McDonald "would [likely] experience some difficulty in remembering, understanding, and following directions." (R. 238.) However, McDonald would not have any difficulty in maintaining attention or sustaining concentration. (R. 238-9.) In addition, it did not appear that McDonald would react negatively to engaging in repetitive tasks. (R. 239.)

Joan P. Williams, Ph.D. On December 7, 2003, Dr. Williams, apparently a state agency psychologist, conducted a mental residual functional capacity assessment based upon a review of McDonald's record. (R. 260.) As part of that assessment, she conducted a psychiatric review. Dr. Williams concluded that McDonald had borderline intellectual functioning. (R. 267.) However, she found that McDonald was not significantly limited in his ability to carry out very short and simple instructions, maintain attention and concentration for extended periods, make simple work-related decisions, and respond appropriately to changes in the work setting. (R. 260-2.)

Patricia K. Ostrander, Ph.D. Dr. Ostrander, a psychologist, conducted a mental diagnostic assessment of McDonald on July 8, 2005, at the request of Fairfield County Job & Family Services. (R. 394.) As part of it, she administered the word recognition subtest from the Wide Range Achievement Test in order to determine any discrepancy between a current score and that recorded by Dr. Ray. Dr. Ostrander noted that McDonald obtained a score at the lower end of the average range and consistent with eighth grade ability. (R. 397.) McDonald stated that his wife had been helping him with his reading skills. (R. 398.) Dr. Ostrander

14

concluded: "Similarly, while his academic skills may be borderline, his cognitive capacity does not appear to be compromised enough to interfere with his ability to secure or maintain employment. Given his cognitive deficits, however, and learning problems, there might be some limitations or restrictions in the range of employment he might be able to explore." (R. 399.)

### Administrative Law Judge's Findings.

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2006.

2. The claimant has not engaged in substantial gainful activity since September 1, 2001, the alleged onset date (20 CFR 404.1520(b), 404.1572 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe combination of impairments: lumbar spondylosis, throacolumbar spondylosis, degenerative disc disease, Graves' disease/hyperthyroidism, learning disorder and depression/anxiety (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 419.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work except that the claimant should not climb ladders, ropes and scaffolds, can occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl and should avoid all exposure to unprotected heights and moving machinery. The claimant has the mental residual functional capacity to perform unskilled, simple and repetitive tasks, which require minimal interaction with the general public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on June 26, 1969 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communication in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2001 through the date of this decision (20 CFR 404.1520(g) and 419.920(g)).

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. ..."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It means "'more than a scintilla.'" *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the

Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments**. McDonald argues that the ALJ's finding that hehad a high school education disregarded the ALJ's finding elsewhere that he had "severe" learning disorder because of which he functioned academically at a 5th to 6th grade level. McDonald argues also that the ALJ erroneously disregarded the testimony of longtime treating specialist Dr Pearlman as to his physical limitations, specifically that McDonald should sit or stand for no more than one half hour at a time.

**Analysis**.

McDonald has raised objections only to the ALJ's findings as to his academic functioning and as to the weight he gave the opinion of Dr. Pearlman. Accordingly, this Report and Recommendation will address only these arguments.

I.    Marginal Education

McDonald testified at the hearing that he completed the twelfth grade in special education. (R. 564.) In her decision, the ALJ concluded that McDonald "has at least a high school education". (R. 25.) In presenting a hypothetical question to the vocational expert, she asked the expert to assume an individual with "the

claimant's age, education and work experience." (R. 582.) McDonald's counsel, upon examination, asked:

> Q. If you additionally assume that academic skills are limited to approximately sixth grade level. Would that eliminate any of the jobs?
>
> A. No. Unless I assumed from the testing that's in the file, that the person was reading at the ninth grade reading level, and had an IQ of 108. The testing that was done in 1987 at Lancaster School. And I think in your hypothetical, if we limit a person to a sixth grade education, I think they could still do the work as a laundry attendant, as a gate keeper, as a surveillance monitor, as an order clerk, as a parking lot attendant, and as a short order cook. I would, I would eliminate jobs such as a host in a restaurant or a self service store counter clerk or any kind of sales work.

(R. 584.)

McDonald argues that Dr. Ray's testing rebutted the presumption that he could function at the grade level ostensibly completed. (Doc. 11 at 8.) He states that the testing established his real functioning at the 5th-6th grade level, and that achievement testing must be determinative where it conflicts with the actual grade level completed. Consequently, McDonald argues, the ALJ should have found him to have a "marginal education". Defendant argues in response that regardless of McDonald's level of education, the ALJ properly took into account his learning disorder, and substantial evidence supported the ALJ's finding of educational achievement. Furthermore, Defendant asserts that McDonald has failed to carry his burden of demonstrating how or why the ALJ's supposed error harmed him. (Doc. 15 at 14-15.) This argument is unrebutted.

In justifying her finding as to McDonald's mental functioning, the ALJ noted that McDonald had reported a learning disorder and was in special education classes. (R. 24.) She addressed Dr. Ray's opinion, noting that it found learning deficits. (R. 20.) However, she also cited the report of Dr. Ostrander, who "opined that while the claimant's academic skills may be borderline, his cognitive capacity does not appear to be compromised enough to interfere with his ability to maintain employment." (R. 24.) Furthermore, she cited the report of Dr. Williams, who "opined that the claimant could make simple work decisions, comprehend and implement simple instructions and tasks and adjust to simple changes in a work site routine." (*Id.*) The ALJ's finding as to McDonald's ability to work despite his mental impairments was therefore supported by substantial evidence.

As the Defendant points out, and as the quotation above indicates, the vocational expert was specifically asked whether she could identify jobs that could be performed by a person with a sixth grade education. She answered in the affirmative – that McDonald could perform jobs such as laundry attendant, surveillance monitor, and order clerk. (R. 584.) When asked by the ALJ to impose a further restriction – that the hypothetical jobs be unskilled, and require minimal contact with the public, the vocational expert still identified several thousand jobs such as food preparation worker, sort, checker, examiner, inspector, and packer. (R. 587-8.)

It therefore appears to have made no difference to the outcome whether the ALJ found that McDonald had a twelfth-grade or sixth-grade education. The ALJ

found, supported by substantial evidence, that McDonald was mentally able to perform simple work. The testifying vocational expert found that, even with McDonald restricted to a sixth-grade education, a significant number of jobs remained available to him. McDonald's objection to the ALJ's finding as to his educational level did not affect the outcome of the case, and therefore is harmless error. *Rutherford v. Comm'r of Soc. Sec.*, 67 Fed.Appx. 333, 334 (6th Cir 2003).

## II.    Dr. Pearlman's Physical RFC

As noted above, Dr. Pearlman completed a form evaluation on June 26, 2007 which offered a very restrictive opinion of McDonald's ability to perform vocational tasks, and which concluded that McDonald was unemployable. As to Dr. Pearlman's opinion, the ALJ found:

> During recent medical visits with his treating physician, Dr. Jon Pearlman, the claimant reports that his medications have continued to be helpful and allow him to maintain his activities at home (Exhibit 16F, p.4). Dr. Pearlman consistently notes that upon physical examination, the claimant appears in no acute discomfort and displays normal muscle tone and strength bilaterally. Consequently, Dr. Pearlman describes the claimant's condition as stable and finds that he is managing well with his current medications." (*Id.*)

> However, in evaluating the claimant's physical capabilities, Dr. Pearlman opined that the claimant can only stand/walk up to half hour a day, sit up to half hour a day, lift/carry 5 pounds frequently and 10 pounds occasionally and can occasionally perform handling but can continuously push/pull, bend, reach and engage in repetitive foot movements. The undersigned accords little weight to Dr. Pearlman's physical capacity evaluation as it is inconsistent with his own treatment notes, in which he reports that the claimant has no significant difficulties during physical examinations and has been able to stabilize his back pain with medication.

(R. 24.) The ALJ went on to agree with and adopt the testifying medical expert's opinion that McDonald could engage in light exertional work, in part because it was consistent with Dr. Pearlman's progress notes.

Plaintiff argues, citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007) that Dr. Pearlman, as a longtime treating specialist, was entitled to the weight of a rebuttable presumption. He points to Dr. Pearlman's approximately 25 contacts with McDonald over the course of four and a half years and abnormal readings from multiple MRIs as providing a basis for his opinion. Plaintiff argues similarly that both the claimant and Dr. Pearlman stated that McDonald needed a sit/stand option, and that the ALJ ignored this restriction.

A treating doctor's opinion is entitled to greater weight than that of a physician who has examined plaintiff on only one occasion or who has merely conducted a paper review of the medical evidence of record. *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983). The treating doctor has had the opportunity to observe his patient's impairments over the course of time.

Furthermore, the Commissioner's regulations provide that he will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1). When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §

404.1527(d)(2). In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision. *Id.*

There is a rebuttable presumption that a treating physician's opinion is entitled to great deference. *Rogers*, 486 F.3d at 242. However, for the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"); *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004).

Here, the ALJ specifically addressed Dr. Pearlman's long history of treating Plaintiff, and even stated that she found Dr. Newman's conclusions persuasive because they were consistent with Dr. Pearlman's treatment notes. However, she also gave specific reasons for discounting Dr. Pearlman's form evaluation that

McDonald was almost completely incapable of activity. His treatment history, especially for the last two years of the treatment record, records Dr. Pearlman's repeated impressions that McDonald's condition was stable and controlled by medication. Although the final entry of June 26, 2007 noted recently increasing pain, McDonald's condition otherwise appeared to become significantly worse only through unusual physical exertion (R. 406) or accidental fall (R. 413). The ALJ apparently found it difficult to reconcile Dr. Pearlman's repeated findings of a stable condition with no acute discomfort and normal muscle strength and tone with a form evaluation that Plaintiff could not sit for longer than half an hour at a time and was unemployable. *Compare* R. 527 ("[h]e transferred from sit to stand without discomfort"), R. 528("Patient reports that he may begin clearing brush... [h]e is advised to perform sedentary work", R. 524 (finding that plaintiff could not sit for more than one half hour in a workday); *see also* R. 492 (Dr. DeGenova's opinion that "whether or not he has his surgery, I do not think he will return to the type of heavy work he was doing previously and he should attempt to find a lighter duty job"). The ALJ reconciled the difference by discounting Dr. Pearlman's form evaluation, and relying upon his treatment notes instead. The Court cannot find that this opinion was not based upon substantial evidence.

From a review of the record as a whole, I therefore **RECOMMEND** that the decision of the Commissioner of Social Security be **AFFIRMED**.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration

by the Court, specifically designating this Report and Recommendation, and the party thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgement of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also*, *Small v. Secretary of Health and Human Services*, 892 F.3d 15, 16 (2d Cir. 1989).

s/Mark R. Abel                        
United States Magistrate Judge
